UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN HENDRIX,<br><br>    Petitioner,<br><br>v.<br><br>WARREN MONTGOMERY,<br><br>    Respondent. | No. 2:20-cv-0531 TLN CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

    Petitioner, a state prisoner proceeding pro se, has filed a second amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. At a Superior Court of Yolo County jury trial, petitioner was found guilty of gross vehicular manslaughter while intoxicated, driving under the influence of drugs causing injury (DUI), four counts of child endangerment, and two counts of infliction of corporal injury. On July 20, 2017, petitioner was given an aggregate sentence of 42 years and 4 months imprisonment in the California Department of Corrections and Rehabilitation. Petitioner presents four claims in his second amended petition. For reasons which follow, the court will recommend that the second amended petition for writ of habeas corpus be denied.

/////

/////

/////

/////

1

I. Background

On direct appeal, the California Court of Appeal summarized the facts presented at trial as follows:

> *The Collision*
>
> In February 2016, Beshia Shoate, her three children, her sister Wyesia, and Wyesia's daughter were homeless and living in a shelter in Davis. Defendant was Beshia's boyfriend and had lived with them before they were homeless. Defendant did not live in the shelter; he spent nights in the sisters' SUV with the dogs.
>
> On the morning of February 24, the three adults took the children to school in West Sacramento and then went to their storage locker and smoked marijuana. Later, they picked the children up from school and went to the library. Defendant left the library with some friends, who were known to use methamphetamine. When defendant returned alone, he had red eyes and was acting "goofy," as he did when he had smoked marijuana.
>
> Defendant drove the group back to Davis so they could check in at the shelter. When defendant left the freeway, he sped up and began swerving around cars. Wyesia's daughter, who was 13, asked him to slow down, but he just shrugged. On Second Street defendant came right up behind another driver (witness Tina Robinson), who was going 35 miles per hour in a 45-miles-per-hour zone. She increased her speed to the speed limit. Defendant backed off at first, but then Robinson heard him "floor it" and he passed her on the right (in the bike lane), narrowly missing a bicyclist (witness Blaise Camp). Robinson honked at defendant; she estimated his speed as 70 to 75 miles per hour. Camp, who races motorcycles, estimated defendant's speed as 70 miles per hour. Camp saw defendant move into the center turn lane, also known as the suicide lane, and pass another car. Another driver in the area estimated defendant's speed as 60 to 80 miles per hour.
>
> Seconds later, there was an explosion. Defendant had crashed into the Honda driven by Cynthia Jonasen. She was killed instantly; her spinal cord was severed. The force of the impact pushed the Honda off the road and left a considerable debris trail.
>
> Bystanders helped Beshia, Wyesia, and their children out of the SUV. All were injured and taken to the hospital.
>
> *Evidence of Defendant's Intoxication*
>
> Corporal Michael Moore from the Davis Police Department responded to the scene. He noticed that defendant's eyes were red and watery; defendant was unsteady on his feet, swaying and unbalanced. He was disoriented, not following directions, and smelled of burnt marijuana. He had thick saliva at the corners of his mouth, or "cotton mouth." These are typical signs of marijuana use and defendant's symptoms were consistent with cannabis use. The SUV had the

2

distinct odor of burnt marijuana and a pipe of the type used to smoke marijuana was found inside with partially burnt marijuana in its bowl.

Moore asked defendant if he was injured and defendant said yes, he thought his arm was broken. He told the paramedic he had smoked marijuana that day. At the hospital, his eyes were still red and he admitted to using methamphetamine a few days before and that he used marijuana daily, although he claimed a high tolerance. Moore checked defendant's eyes and his right eye was unable to maintain convergence; lack of convergence can be caused by marijuana intoxication. Moore also administered a modified Romberg test where defendant estimated 30 seconds to be 19, outside the normal variance. Moore arrested defendant based on the objective symptoms of intoxication consistent with marijuana and methamphetamine. He also prepared a warrant to test defendant's blood. At trial, Moore opined that defendant was impaired, primarily from marijuana.

The physician who saw defendant in the emergency room diagnosed him with poly substance abuse. His urine test was positive for marijuana, and his pulse was between 98 and 120, above normal. Defendant's blood samples tested positive for THC and methamphetamine. A heavy user may have marijuana in his system for weeks and both THC and methamphetamine can remain in the system after impairment. A criminalist testified that based on the test results, defendant had used methamphetamine in the past 48 hours.

Defendant was interviewed while at the hospital. He claimed he was driving at 45 miles per hour: "I drive real nice." He said he smokes marijuana "all the time" and was not under the influence. He last smoked methamphetamine three or four days before; he had to smoke a lot of marijuana to get high.

*Evidence of Defendant's Speed*

At trial, the People presented evidence of three different investigations to establish defendant's speed at the time of the crash. Sergeant Rod Rifredi, the lead of the major accident investigation team, estimated the speed of the SUV at 75 to 85 miles per hour based on the damage to the vehicles, the intrusion to the Honda, the front-end damage to the SUV, how far apart the vehicles were post-collision, the grade of the roadway, and the size of the debris field. The speedometer of the SUV was stuck at 72 miles per hour after the crash.

Rifredi removed the restraint control module (RCM) from the SUV. The RCM provides data from sensors through the vehicle that notify the secondary restraint systems, airbags and seat belts, of a crash. When there is a crash, the seat belts pull the occupant into an upright position to prepare for deployment of the airbag. The RCM provides data about the timing of these actions and also some information about the speeds and characteristics of the vehicle. Rifredi also reached out to Chris Kauderer, a collision reconstructionist, as he needed a higher level of expertise and equipment.

Robert Andres worked for Continental Automotive Systems, and he was responsible for hiring and firing, as well as the technical day-to-day issues of the algorithm for vehicle safety issues. The algorithm is the software that interprets inputs from a crash to determine when the airbags should be deployed. He explained there is a speed sensor in each wheel and the vehicle's speed is sent over a device called a controller area network (CAN bus) to the RCM and recorded. The CAN bus is a communication bus that broadcasts and receives information and shares information between the different electronic systems. Andres received the RCM from the SUV. He extracted the information from the SUV's RCM and prepared a report. In response to defense objections to lack of foundation as to the accuracy of the vehicle speed from the RCM, Andres testified the RCM goes through testing, including software and crash testing, to ensure it records accurately. He explained that crash testing is a good check because the exact speed is known. Andres testified that to the best of his knowledge, based on his training and experience and the testing procedures of the RCM, the information about the SUV's speed (presented to the jury on a chart) was true and accurate.

Kauderer, the accident reconstructionist, received the RCM data from the SUV and used it to reconstruct the collision. The RCM data showed defendant was going 80 miles per hour one second before the collision. He was slowing, so Kauderer determined he was going about 76 or 77 miles per hour at impact. At five seconds before the collision, the SUV accelerator was at 74 percent of maximum. At three seconds out, there was no acceleration. One second before the collision, the SUV's brakes were applied, but not firmly enough to engage the antilock braking system.

Kauderer also performed an analysis using the EDCRASH software designed for a collision where other methodologies cannot be used. The EDCRASH analysis does not use RCM data; it is a completely separate analysis. The EDCRASH analysis uses three dimensional laser scanners to measure the amount of intrusion on each vehicle. After inputting data about the vehicles' weights, position at impact, and position after the collision, the program uses an iterative process to determine speed. Averaging the results, Kauderer determined the SUV was travelling at about 79 miles per hour at impact and the Honda at 10 miles per hour. He also determined that the SUV was 380 to 493 feet away when the Honda entered the roadway. At 45 miles per hour, the SUV needed 189 feet to stop; at 55 miles per hour, it needed 256 feet. Kauderer concluded the SUV had ample time to stop without striking the Honda if it had been traveling at the speed limit.

*The Defense*

The defense conceded defendant was speeding, but contested whether he was intoxicated. The defense offered other explanations for defendant's condition after the crash, including the trauma of the crash, and that he had a lazy eye. The defense also focused on the varying accounts of events given by the occupants of the SUV and

/////

4

> provided expert testimony that children were more susceptible to memory contamination.

ECF No. 28-23 at 1-5.

The California Court of Appeal affirmed petitioner's convictions and sentences. Petitioner sought review of the Court of Appeal's decision in the California Supreme Court. ECF No. 28-24. The petition for review was denied. ECF No. 28-25.

II. <u>General Standards For Relief Under 28 U.S.C. § 2254</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular

5

> case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claims and Analysis

    A. Sufficiency of the Evidence Regarding "Care or Custody"

Petitioner asserts his convictions for child endangerment must be vacated because there was not sufficient evidence presented at trial that petitioner had "care or custody" of the children in his car at the time of the accident as required under California Penal Code § 273a(a). The California Court of Appeal, the only California Court to issue a reasoned decision with respect to petitioner's claim, addressed the claim as follows:

> A. *The Law*
>
> Subdivision (a) of section 273a provides in part: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, ... having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished ...."

6

The terms "care and custody" have "no special meaning" "beyond the plain meaning of the terms themselves. The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [interpreting section 273ab].) "[T]he relevant question in a situation involving an individual who does not otherwise have a duty imposed by law or formalized agreement to care for a child (as in the case of parents or babysitters), is whether the individual in question can be found to have undertaken the attendant responsibilities at all. 'Care,' as used in the statute, may be evidenced by something less than an express agreement to assume the duties of a caregiver. That a person did undertake caregiving responsibilities may be shown by evidence of that person's conduct and the circumstances of the interaction between the defendant and the child; it need not be established by an affirmative expression of a willingness to do so." *(People v. Perez* (2008) 164 Cal.App.4th 1462, 1476 [interpreting section 273a, subd. (b) ].)

In *People v. Morales* (2008) 168 Cal.App.4th 1075, defendant was driving with a teenage passenger when a police officer attempted to pull the car over. Defendant evaded the officer, sped through a stop sign, and collided with a telephone pole and a metal post. (*Id*. at p. 1078.) On appeal, defendant contended his conviction for child endangerment must be reversed because there was insufficient evidence he had "care or custody" of the teenager. (*Id*. at p. 1082.) In rejecting this contention, the appellate court reasoned: "[The teenager] was physically in the care of defendant who was transporting her when he endangered her life by his conduct. As a passenger in his speeding car, [the teenager] was deprived of her freedom to leave, and she had no control over the vehicle. The jury could reasonably conclude that in taking it upon himself to control [the teenager's] environment and safety, defendant undertook caregiving responsibilities or assumed custody over her while she was in his car." (*Id*. at pp. 1083-1084.)

B. *Analysis*

Following the reasoning of *Morales*, there is sufficient evidence that defendant had "care or custody" of the children as required by statute. The children were physically restrained in a moving car and in defendant's care when he drove them from West Sacramento to Davis; they could not leave the SUV. He alone had control of the SUV, and he put the children in danger by his illegal driving.

Defendant contends *Morales* is not controlling for two reasons. First, he contends its definition of "care and control" was implicitly overruled in *Winn v. Pioneer Medical Group* (2016) 63 Cal.4th 148 (*Winn*). At issue in *Winn* was whether the definition of neglect under the Elder Abuse and Dependent Adult Civil Protection Act (Act), which requires a person have "the care or custody" of the elder or dependent adult, applied when a healthcare provider, providing outpatient care, fails to refer the elder adult to a specialist. Our Supreme Court concluded "the Act does not apply unless the defendant health care provider had a substantial caretaking or

7

custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient." (*Id*. at p. 152.) Focusing on examples of neglect in the statute--such as the failure to assist with personal hygiene or provide food, clothing, shelter or medical care, or to prevent malnutrition or dehydration--the high court found they contemplated "the existence of a robust caretaking or custodial relationship," more than "casual or limited interactions." (*Id*. at p. 158.)

The *Winn* court noted its conclusion was consistent with analogous provisions of other statutes using the phrase "having the care or custody" and pointed to section 368, the elder abuse statute, which in turn was derived from the felony child abuse (or endangerment) statute. (*Winn*, *supra*, 3 Cal.4th at pp. 161-162.) Defendant seizes upon this language and argues *Morales* is inconsistent with *Winn* because it did not require "a robust caretaking or custodial relationship."

We are not persuaded that *Winn* overruled *Morales*. First, *Winn* did not mention *Morales*, or any of the cases defining "care or custody" for purposes of child endangerment. Second, the *Winn* court focused on the examples of neglect set forth in the statute at issue in that case; all the examples involved the failure to provide basic needs for the elder or dependent adult. (*Winn*, *supra*, 63 Cal.4th at pp. 157-158.) Drawing on these examples, the court concluded the appropriate standard for "care or custody" in the context of neglect under the Act is a "substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs." (Id. at p. 152.)

Section 273a, by contrast, has a broader scope and covers not only failure to provide basic needs, but also "willfully caus[ing] or permit[ting] that child to be placed in a situation where his or her person or health is endangered." The context of the two cases is widely divergent; *Winn* does not affect *Morales*. *Winn* was concerned with heightened civil liability of a medical provider; we are concerned here with criminal liability for the well-being of children who were completely under defendant's control when his driving placed them in grave danger.

Defendant next contends that *Morales* was wrongly decided and should not be followed. He faults *Morales* for requiring only physical custody without regard to the relationship between the defendant and the child. But a focus on defendant's absolute control over the children's environment appears appropriate in this case, where defendant put the children at risk by his driving and they could not escape the danger into which he was, literally, transporting them. One of the children asked him to slow down and he refused. Moreover, here the record established that defendant was not a stranger to the children and had more than "casual or limited interactions." (*Winn*, *supra*, 63 Cal.4th at p. 158.) He had dated Beshia for two years and had lived with the group before they became homeless. During the interview, defendant repeatedly referred to the SUV's occupants as "my family," and "my kids." In denying he was speeding, he explained: "I wouldn't be high smoking weed with my

8

>kids in the car." There was sufficient evidence for the jury to find defendant had the requisite "care or custody" of the children.

ECF No. 28-23 at 5-8.

As indicated above the resolution of petitioner's first claim turns on the definition of "care or custody" as it appears in California Penal Code § 273a(a). Generally speaking, interpretation of a California criminal statute is a matter of California law and not a basis for federal habeas relief. Bradshaw v. Richey, 546 U.S. 74, 75 (2005). This is not to say that an interpretation that is an unreasonable departure from the plain meaning of the statute can not violate the Due Process Clause of the Fourteenth Amendment, see Chavez v. Dickson, 280 F.2d 727, 731 (9th Cir. 1960). However, that is not the case here. Petitioner's first claim must be rejected.

B. Accomplice Instruction

Petitioner asserts that the trial court violated his Constitutional right to a fair trial by not providing jurors with an accomplice instruction concerning the testimony of Beshia and Wyesia Shoate as to the child endangerment counts. A review of the record reveals that petitioner has not exhausted state court remedies with respect to this claim which he must do in order to be entitled to relief. 28 U.S.C. § 2254(b)(1). A petitioner satisfies the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court. Picard v. Connor, 404 U.S. 270, 276 (1971). While petitioner presented an accomplice instruction claim to the California Supreme Court via collateral review, petitioner asserts a violation of state law, not federal law as he does here. ECF No. 28-26 at 22.

In any case, petitioner's claim is not meritorious.[1] Petitioner claims Beshia and Wyesia Shoate were accomplices with respect to the child endangerment counts as they were aware of petitioner's drug use prior to the crash and still allowed petitioner to drive their children.

/////

/////

---

[1] A claim may be denied on the merits without exhaustion of state court remedies. 28 U.S.C. § 2254(b)(2).

As noted by the California Court of Appeal, the law in California with respect to accomplice testimony and instructions is as follows:

> "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)
>
> "If there is evidence that a witness against the defendant is an accomplice, the trial court must give jury instructions defining 'accomplice.' [Citation.] It also must instruct that an accomplice's incriminating testimony must be viewed with caution [citation] and must be corroborated [citation]." (*People v. Felton* (2004) 122 Cal.App.4th 260, 267-268.)
>
> "'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" *(People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.)

ECF No. 28-23 at 8.

Ultimately, the court found that any error in not giving the accomplice instruction was harmless.

> There was ample evidence to corroborate Beshia's and Wyesia's testimony about defendant's drug use that day. Moore concluded defendant was under the influence based on his physical condition and field sobriety tests performed at the hospital. A bystander reported that he had slurred speech and appeared drunk. Two of the children testified he appeared "more serious" or "tired with red eyes" when he returned to the library. The drug tests were positive for both marijuana and methamphetamine, and multiple experts testified tolerance does not correlate with impairment. Marijuana and a pipe used to smoke marijuana with partially burnt marijuana in the bowl were found in the SUV.

Id. at 8-9.

In United States v. Augenblick, 393 U.S. 348, 353 (1969) the Supreme Court held:

> When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions. Of course, if knowing use of its perjured character were

> linked with any testimony [citations omitted], we would have a problem of different dimensions. But nothing of the kind is involved here.

Essentially, the Supreme Court held that the Constitution does not require any particular protection with respect to accomplice testimony as is provided under California law. As such, petitioner is not entitled to federal habeas relief as to his accomplice instruction claim.

Even if petitioner has identified a federal claim upon which he could obtain relief, petitioner would have to show that failure to give the accomplice instructions created a "substantial and injurious effect or influence" in the determination of the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637–38 (1993). For the reasons identified by the California Court of Appeal, specifically that there was more than sufficient evidence presented with respect to petitioner's drug use without the testimony of Beshia and Wyesia Shoate, the court cannot find that the failure to give the accomplice instructions had any negative effect on the jury.

### C. Insufficient Evidence to Sustain Manslaughter and DUI Convictions

Petitioner asserts that his convictions for manslaughter and DUI causing injury must be reversed because the jury was given an insufficient legal theory upon which the convictions could be based. Petitioner asserts that the convictions are fundamentally unfair in violation of the Constitution.

As with petitioner's second claim, petitioner has not exhausted state court remedies with respect to this claim. Petitioner presented a similar claim to the California Supreme Court via collateral review, but that claim arises under California law. ECF No. 28-26 at 25.

In any case, as with claim 2, claim 3 is not meritorious.[2] Essentially, petitioner argues that based upon instructions the jury could have used his passing Tina Robinson on the right in the bike lane as a basis for convicting on manslaughter and DUI even though that conduct did not cause the collision with Cynthia Jonasen. The California Court of Appeal described the background as to petitioner's claim as follows:

> Defendant was charged in count one with implied malice murder. The jury was instructed that to find guilt it had to find, among other things, that defendant's actions were dangerous to human life and that

---

[2] See note 1.

11

he knew it, and that he acted with conscious disregard of human life. For count two, gross vehicular manslaughter, the jury was instructed it had to find that defendant committed a misdemeanor, infraction, or otherwise lawful act that might cause death with gross negligence, and that grossly negligent conduct caused the death of another. For count three, DUI causing injury, the instruction required that defendant commit an illegal act or fail to perform a legal duty and such illegal act or failure to perform a legal duty caused bodily injury to another.

As such, the instructions required the jury to find causation as to counts two and three--that defendant's infractions caused the death and injury--but not as to count one.

The jury was instructed on various driving infractions under the Vehicle Code. The trial court instructed on violation of the maximum speed law and violation of the basic speed law (driving faster than reasonable for the conditions), as well as six additional infractions, set forth in Instructions A-F: failure to maintain a lane, unsafe lane change (moving left or right), illegal passing to left, unsafe lane change (failure to pass left), following too closely, and illegal passing within the bicycle lane.

The jury could consider and apply these infractions for different purposes. It could rely on any of the eight infractions it found true to satisfy the elements of implied malice murder: that defendant's conduct was dangerous to human life and he knew it, and that he acted with conscious disregard. However, because both counts two and three required a causal connection between the infraction and the death or injury, the infractions that the jury could find to support those counts were limited to those infractions that occurred just before the collision. Accordingly, the trial court instructed the jury that it could rely only on the two speeding infractions, failure to maintain lane, unsafe lane change (moving left or right), and illegal passing to the left to find defendant guilty of counts two and three. Instructions D-F, unsafe lane change (failure to pass left), following too closely, and illegal passing within the bike lane, told the jury these infractions could be used only on the murder count, not on counts two or three. The trial court emphasized this limitation by rereading it to the jury just before closing arguments.

ECF No. 28-23 at 9-10. The Court of Appeal addressed petitioner's state law claim as follows:

Although defendant frames his contention as one of legal insufficiency, his actual argument is that here the facts do not support the instruction. An unsafe lane change, moving either left or right, could be part of the basis for finding vehicular manslaughter or DUI, but moving to the right could not be used as a basis for such findings in this case because there was no evidence that movement to the right (into the bicycle lane) caused Jonasen's death. The evidence showed that defendant's move to the left, into the suicide lane, immediately preceded the accident. In effect, defendant is arguing there was insufficient evidence that his movement to the right in violation of

> Vehicle Code section 22107 could serve as a basis for counts two or three because the necessary causal connection was missing. . .
>
> Viewing the instructions as a whole, we determine that here there is no reasonable likelihood the jury applied Instruction B to find defendant guilty of counts two and three based on his movement to the right and into the bike lane.
>
> The only evidence that defendant made an unsafe lane change to the right was when he crossed into the bike lane. The jury was explicitly--and repeatedly--told that this conduct could not be used to find guilt on counts two or three. Further, the jury was instructed that the grossly negligent conduct or illegal act had to cause the death or bodily injury. We presume the jury followed the instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 764.)
>
> Defendant argues the jury could reasonably have followed the language of Instruction B and used his movement to the right into the bike lane to find gross negligence. We disagree. First, the jury would have had to disregard the more explicit instructions that the movement into the bike lane could not be so used. Second, the jury would have had to ignore the instructions that required a causal connection between the conduct and the collision and resulting injuries. "An appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.) Nothing in the record supports the view that the jury acted so unreasonably as to rely on Instruction B while disregarding more explicit instructions not to consider driving into the bike lane in support of these counts and to consider only infractions that caused the collision.
>
> Further, as defendant points out, the jury was instructed there could be more than one cause of death and in determining gross negligence it was to consider the way defendant drove and other relevant aspects of his conduct. Here, overwhelming evidence showed that defendant was driving about 30 miles per hour over the posted speed. In closing, defense counsel conceded defendant was speeding. Counsel conceded the jury could consider defendant's speeding as causing the death, but argued the other infractions occurred earlier or were not proven. The People argued the defense conceded speeding and only one infraction was needed. On this record it is inconceivable that the jury ignored the abundant evidence of speeding and based its verdicts on counts two and three on defendant's incursion into the bike lane despite explicit instructions not to do so.

ECF No. 28-23 at 11-12.

The court agrees with the Court of Appeal that petitioner's claim has more to do with the fairness of the instructions given to the jury as opposed to insufficiency of the evidence. Under federal law, a claim of instructional error can provide a basis for habeas corpus relief if the

/////

13

instructions given, as a whole, rendered the trial fundamentally unfair thereby violating the Due Process Clause of the Fourteenth Amendment. Cupp v. Naughten, 414 U.S. 141, 147 (1973).

The court also agrees with the Court of Appeal that, taken as a whole, there was nothing wrong with the instructions given.  It was clear to jurors that whatever act they chose in order to satisfy the elements of manslaughter and DUI causing injury had to actually cause death in the case of manslaughter and injury in the case of DUI causing injury.  Also, evidence was presented concerning other qualifying acts such as speeding.  For the jury to have done as petitioner suggests and find petitioner guilty of manslaughter and DUI causing injury based on the fact that he passed Tina Robinson on the right and in the bike lane, they would have had to ignore the instructions given and the evidence presented.  Nothing before the court suggests that was the case.  Petitioner's third claim must be denied.

### D. Lack of Adequate Foundation for Expert Testimony

In his final claim, petitioner asserts that the trial court abused its discretion in allowing jurors to consider data collected by the Restraint Control Module in petitioner's vehicle. Petitioner asserts that the prosecution did not establish a proper evidentiary foundation for the evidence admitted.  Again, the court cannot entertain violations of state law in a § 2254 action. Petitioner does not argue that his federal rights were violated in claim four and no obvious violation is apparent from what is alleged.  For these reasons, petitioner is not entitled to federal habeas relief as to his fourth and final claim.

## IV. Conclusion

For all the foregoing reasons, the court will recommend that petitioner's second amended application for a writ of habeas corpus be denied and this case be closed.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's second amended petition for a writ of habeas corpus (ECF No. 26) be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 28, 2022

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
hend0531.157